IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DESHAWN JAMEL GREENE,               )
                                    )
              Petitioner,           )
                                    )          1:14CV900
         v.                         )          1:10CR144-1
                                    )
UNITED STATES OF AMERICA,           )
                                    )
              Respondent.           )

### MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

     Deshawn Jamel Greene ("Petitioner") has moved to vacate,
set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.
(Doc. 67.)[1]  The Government has responded in opposition to the
Petition (Doc. 71), and Petitioner has replied (Doc. 74).
Petitioner has also moved to amend his motion to vacate. (Doc.
75.) This matter is now before the court for a ruling.  See Rule
8, Rules Governing § 2255 Proceedings.  For the following
reasons, this court will grant an evidentiary hearing in this
matter.

---

     [1] Unless otherwise noted, this and all further citations to
the record are to the docket in the criminal case (1:10CR144-1).

## I.  BACKGROUND

Petitioner was indicted in this court on April 26, 2010.
(See Indictment (Doc. 1).)  Counts One and Two relate to a bank
robbery perpetrated by Petitioner and his co-defendant on May 6,
2009. Count Two charges Petitioner with armed bank robbery, in
violation of 18 U.S.C. § 2113(d); and Count One charges the
lesser-included offense of bank robbery, in violation of 18
U.S.C. § 2113(a). (Id. at 1-2.) Count Three alleges that
Petitioner and/or his co-defendant brandished a firearm during
and in relation to the bank robbery, in violation of 18 U.S.C.
§§ 924(c)(1)(A)(ii) and 2. (See id. at 2-3.)  Petitioner entered
a plea of not guilty as to all counts, and after a three-day
trial, the jury returned a verdict finding Petitioner guilty as
to all three counts.[2]  (Verdict (Doc. 27).)

Prior to sentencing in this matter, a Presentence Report
("PSR") was prepared.  The PSR noted that Petitioner met the
requirements for a sentence under the Armed Career Criminal Act,
codified at 18 U.S.C. § 924(c) ("ACCA"), and as a result, his

---

[2] Petitioner made a pro se motion to set aside the verdict.
(Doc. 34.) At Petitioner's sentencing, this court granted that
motion in part by oral order, striking the jury verdict finding
Petitioner guilty as to Count One and vacating the Judgment as
to Count One because both Count One and Count Two related to the
same robbery.  (See Sentencing Hr'g Tr. (Doc. 60) at 7.)

guideline imprisonment range was 360 months to life. (PSR ¶ 38.)
Petitioner's counsel filed a Position Paper arguing that this
court should vary the sentence downward under the ACCA, as
Petitioner committed two of his robbery offenses "when
[Petitioner] was only 19 years of age," and the convictions,
"which were not separated by an intervening arrest, occurred
only about a month and one-half apart." (Def.'s Position with
Respect to Sentencing Factors (Doc. 38) at 1.)  This court
acknowledged the argument, but, given the serious nature of the
offenses and the fact that Petitioner committed his third
robbery less than twelve months after his release from a twelve-
year sentence for his previous robberies, this court found that
a 360-month sentence was sufficient but not greater than
necessary.  (See Sentencing Hr'g Tr. (Doc. 60) at 18-20.)  This
court implemented that ruling by sentencing Petitioner to 276
months as to Count Two and 84 months as to Count Three to run
consecutive to Count Two.  (Id. at 20-21; Judgment (Doc. 40) at
2.)

      Petitioner also made several pro se motions in between
trial and sentencing, including a motion seeking a change in
counsel.  (See Pet'r's Mot. to Terminate Counsel (Doc. 33).)  In
his motion, Petitioner contended that he and counsel had "an

insurmountable personality conflict," that "counsel failed to move to suppress evidence as to [Petitioner's] codefendant . . . den[ying] [Petitioner] his constitutional right of confrontation as guaranteed under the Sixth Amendment," and that "[c]ounsel allowed the Government to arrest [Petitioner] without marandarizing [sic] him making his conviction invalid." (Id. at 1-2.)

This court denied each of these motions at sentencing, explaining that this court:

> sat as the trier of fact in [Petitioner's] case and has heard the evidence; and based upon what's been submitted in terms of the motions in this case, . . . those motions should be denied as failing to set forth a sufficient basis in either law or fact that would require the Court to dismiss [counsel] and appoint new counsel for [Petitioner] in this case.

(Sentencing Hr'g Tr. (Doc. 60) at 5.)

After sentencing, Petitioner appealed, arguing that the court had erred in admitting the testimony of a bank clerk as well as by not providing the jury with an instruction regarding eyewitness identification. See United States v. Greene, 704 F.3d 298, 303 (4th Cir. 2013). His appeal was denied on both grounds, and the Supreme Court denied certiorari. See Greene v. United States, ____ U.S. ____, 134 S. Ct. 419 (Oct. 15, 2013). Petitioner now brings the instant action, alleging ineffective

assistance of counsel based upon a variety of allegedly
deficient actions and inactions. (<u>See</u> Petitioner's Motion to
Vacate, Set Aside, or Correct Sentence ("Pet'r's Mot.") (Doc.
67) at 16-41.)[3]

## II.  <u>FACTS</u>

The Fourth Circuit summarized the relevant facts elicited
at trial as follows:

> On May 6, 2009, an armed individual robbed the Fifth
> Third Bank in Kannapolis, North Carolina. The
> individual entered the bank around 11:30 a.m., pointed
> a silver-colored revolver at two employees, and
> demanded money. The robber first walked up to the
> counter of teller Alice Bolder, who was so frightened
> that she got under her counter. He then turned toward
> teller Kevin Morrison, pointed the gun at Morrison's
> chest, and demanded money. Morrison emptied a cash
> drawer and put the money into a bag. The robber then
> returned his attention to Bolder, pointing the gun at
> her and telling her to get up. Bolder did so, and she
> placed cash, along with a dye pack, into a purple bag
> given to her by the robber. The robber then left the
> bank. The total amount taken was $1,798.
>
> Witnesses gave police varying accounts of the
> appearance of the robber, who was wearing a disguise,
> in the immediate aftermath of the event, and they
> later testified to varying descriptions at trial.
> Shortly after the robbery, Bolder described the robber
> as an African-American male wearing a female wig, a
> long skirt, pants underneath the skirt, sneakers, a
> felt-type jacket with an emblem on it, large
> sunglasses, and carrying a purple tote bag. On one
> page of a robbery description form, Bolder described

---

[3] All citations to documents filed with the court refer to
the page numbers in the bottom right hand corner stamped during
the electronic filing process and as they appear on CM/ECF.

the robber as being 6-feet-5-inches tall and weighing
about 160 pounds. On a second page of the form, she
wrote that the robber was 6-foot-2. Morrison described
the robber as a male wearing a long black skirt, a
wig, large sunglasses, and a black hoodie. In a
robbery description form, Morrison wrote that the
robber was between 6 feet and 6-foot-2 and appeared to
weigh between 140 and 160 pounds.

At trial, bank employee Kathy Jarvis testified the
robber was an African-American "dressed in all black,"
but provided no further description. She said she
could not tell if the robber was a man or a woman.
Jarvis testified that the robber took three minutes.
Morrison testified that it took five to ten minutes,
and Bolder testified that it lasted ten to fifteen
minutes.

A witness standing outside the bank, Sonya Shell,
testified that she saw a "strangely dressed" person
with a red wig, but could not tell if the person was a
man or a woman. Shell testified that after the robber
left the bank, she saw the dye pack explode — "a big
cloud of pink smoke went up in the air" — and the
robber got into a silver car and "they took off."

The investigation of the robbery that ultimately led
to Appellant Greene first focused on the silver
getaway vehicle. An anonymous tip alerted police that
the car involved in the robbery could be found at a
house in nearby Enochville, North Carolina. An officer
went to the house and found a silver Honda belonging
to Angela Lear. During a consent search of the
vehicle, the officer noted red stains inside the car
consistent with the discharge of a red dye pack, and
later testing confirmed that the stains were
consistent with substances contained in such packs.
Officers located Angela Lear's husband, Jay Dustin
Lear, who told police at first that he had loaned the
silver Honda to a crack dealer named "Slim" on the day
of the robbery. In a second interview soon thereafter,
Lear changed his story. He admitted that he and Greene
(known to Lear by his street name, "Train") planned

-6-

the bank robbery and that Greene was the one who
entered the bank.

Specifically, Lear testified as follows, pursuant to a
plea agreement after pleading guilty to his role in
the robbery. On the morning of the robbery, he picked
up Greene at the home he shared with his girlfriend.
Greene had a chrome handgun. He dropped Greene off at
the Fifth Third Bank, drove down the block, and then
drove back to the bank to pick up Greene after the
robbery. They then drove to a nearby apartment where
they stashed the stolen money and the costume Greene
wore in the robbery. Lear gave some of the money to
two friends, who took it to car washes to "recycle" it
by exchanging it for coins.

Later, police found red-stained United States currency
in the car wash change machines. Police found no
physical evidence linking Greene to the crime. They
searched for but did not find any identifiable prints
at the bank. They did not find any of Greene's
fingerprints in the silver Honda. Police did not
process for fingerprints the currency recovered from
the change machines. Police searched for but could not
locate the articles used in the robbery — the purple
bag, the dress, the wig, and the gun (although they
recovered a pair of sunglasses from Greene's
residence). Police never asked any witnesses to the
robbery, including the bank employees, to identify any
potential suspect in a lineup or photo array. Thus,
the only direct evidence of Greene's participation in
the robbery was Lear's testimony to that effect. Lear,
a longtime drug addict and a convicted felon, was
subjected to vigorous cross examination.

Greene, 704 F.3d at 301-03 (internal citations omitted).

## III. DISCUSSION

Generally, Petitioner's claims fall into three categories:

ineffective assistance of counsel during pretrial and at trial,

ineffective assistance of counsel on appeal, and finally, that

-7-

his prior offenses do not qualify him for career offender status.

To prove ineffective assistance of counsel, a petitioner must establish that: (1) his attorney's performance fell below a reasonable standard for defense attorneys, and (2) he was prejudiced by this deficient performance. See Strickland v. Washington, 466 U.S. 668, 688, 691-92 (1984). A petitioner is not entitled to a hearing based upon unsupported, conclusory allegations.  See Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992), abrog'n on other grounds recog'd, Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999).  A petitioner bears the burden of affirmatively showing deficient performance. See Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994).  To establish prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland, 466 U.S. at 694.  A reasonable probability is one "sufficient to undermine confidence in the outcome." Spencer, 18 F.3d at 233 (citing Strickland, 466 U.S. at 694).

Claims of ineffective assistance of counsel on appeal are also judged using the Strickland test. See Lawrence v. Branker,

517 F.3d 700, 708-09 (4th Cir. 2008).  Appellate counsel need
not raise on appeal every non-frivolous issue requested by a
defendant. <u>Jones v. Barnes</u>, 463 U.S. 745, 752-53 (1983); <u>see</u>
<u>Evans v. Thompson</u>, 881 F.2d 117, 124 (4th Cir. 1989).
Ineffective assistance of appellate counsel can be shown by
demonstrating that "counsel omitted significant and obvious
issues while pursuing issues that were clearly and significantly
weaker." <u>Bell v. Jarvis</u>, 236 F.3d 149, 180 (4th Cir. 2000)
(citation omitted).

     To obtain a hearing or any form of relief, a habeas
petitioner must come forward with some evidence that their
claims might have merit.  <u>See</u> <u>Nickerson</u>, 971 F.2d at 1136; <u>see</u>
<u>also</u> Rule 8, Rules Governing § 2255 Proceedings (noting that a
judge must review the materials in the case to determine if a
hearing is warranted).

## A.   Ground One – Ineffective Assistance during Pretrial and Trial

     Petitioner first argues that his attorney rendered
ineffective assistance during the pretrial and trial stages of
his case for a litany of reasons, amounting to eleven
allegations in total. The court notes that the Government has
filed a declaration from Petitioner's trial counsel that
responds directly to each allegation by explaining counsel's

-9-

choice.  (See Government's Resp. to Petition under 28 U.S.C.
§ 2255 ("Gov't Resp."), Attach. A, Declaration of William S.
Trivette ("Trivette Decl.") (Doc. 71-1).)  These allegations
fall into several broader categories of allegedly deficient
representation.

### 1.  Failure to Investigate and Interview

In the first and largest group of alleged deficiencies,
Petitioner alleges that, during the pretrial stage of his
proceedings, his counsel rendered ineffective assistance by
failing to interview witnesses and to investigate and raise
issues at trial that Petitioner claims to have discussed with
him.

"[S]trategic choices made after less than complete
investigation are reasonable precisely to the extent that
reasonable professional judgments support the limitations on
investigation."  Strickland, 466 U.S. at 690-91.  "[I]n any
ineffectiveness case, a particular decision not to investigate
must be directly assessed for reasonableness in all the
circumstances, applying a heavy measure of deference to
counsel's judgments."  Id. at 691 (emphasis added).

Petitioner alleges that counsel failed to interview the
following individuals: (1) Rebecca Saunders, the mother-in-law

-10-

of Petitioner's co-defendant Jay Dustin Lear ("Dustin Lear");
(2) a police officer named Lt. Kenneth Jackson; (3) Larry
Hazlip, Timothy Dinello, and Daniel Yarborough, three prisoners
who were housed in prison with the co-defendant Dustin Lear; (4)
Janice Hester[4]; (5) Brandy White, a friend of Dustin Lear; and
(6) Dustin Lear himself.  (Pet'r's Mot. (Doc. 67) at 22-23,
34-37.)

Petitioner's claims as to these alleged deficiencies are
without merit, as Petitioner has failed to explain what
evidence, witness testimony, or cross-examination topics would
have come out of any interviews, or if any such information did
arise, how it would have altered the outcome of the case.  See
Edwards v. Jackson, No. 3:08-cv-584-RJC, 2012 WL 137413, at *5
(W.D.N.C. Jan. 18, 2012) ("Petitioner has failed to show how any
specific witness testimony would have altered the outcome of the
case.").

### a.  Rebecca Saunders

Petitioner first alleges that counsel failed to interview
Rebecca Saunders, Lear's mother-in-law.  Ms. Saunders did not
testify at trial, although she was interviewed by the police

---

[4] Janice Hester is apparently the girlfriend of the father
of Petitioner's girlfriend. (See Pet'r's Reply (Doc. 74) at 15.)

-11-

and, according to the police notes, (Pet'r's Reply, Ex. 2b (Doc. 74) at 45), she told them both that the car described in the anonymous tip belonged to her son-in-law, Dustin Lear, and that on the day of the robbery, she had seen a black male come to Lear's home, and that Lear provided him with a shirt to wear. (See Pet'r's Mot. (Doc. 67) at 22.)

Petitioner alleges that, due to the allegations at trial involving "the changing of clothes which was not known to Ms. Saunders it is inconceivable that counsel did not question her as to identification, time or the events surrounding this evidence."[5] (Id.) Petitioner alleges that counsel "had a duty to determine who this Black Male was and why he needed to drive over to Lear's home to obtain clothing." (Pet'r's Reply (Doc. 74) at 6.)

Petitioner has failed to provide any explanation as to what an interview of Ms. Saunders would have produced, or how it would have affected the result of the trial. Counsel states that Ms. Saunders did not have any material information, and Petitioner does not allege that she could identify the

---

[5] As noted above, facts were elicited at trial from Dustin Lear that Petitioner dressed up in a wig and skirt while robbing the bank to hide his identity, and then later changed back into normal clothes after the robbery. (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 99-105.)

-12-

individual she saw receive a shirt from Lear, or give any
further information regarding the day of the robbery.
Petitioner's apparent contention that the black male at issue in
Ms. Saunders' statement is a separate individual is conclusory,
and Petitioner does not sufficiently explain how an exploration
of this topic could have affected the trial.  Petitioner alleges
generally that "[h]ad Counsel asked and discovered this
information prior, he would have been able to question Lear as
to who and why." (Id.)  Petitioner does not explain how Ms.
Saunders would have been able to identify this "other" person,
nor how this knowledge would have been useful in cross-examining
Lear, who had already identified his co-defendant as Petitioner,
and who never mentions the incident described by Ms. Saunders
while on the stand. Counsel explains that Ms. Saunders was
simply not an important witness and did not have material
evidence, and as such, he did not interview her before trial, a
reasonable decision under the circumstances. (See Trivette Decl.
(Doc. 71-1) at 3-4.)

### b.  **Lt. Kenneth Jackson**

Petitioner next alleges that counsel failed to interview
Lt. Jackson, the investigating officer from the police
department. Petitioner alleges that Lt. Jackson had received

-13-

information from Investigator Inch in the Charlotte Police
Department, who had purportedly identified a photo of the
suspect as a cross-dressing criminal whom he was familiar with
in the area named Antonio Dewayne Harris. (Pet'r's Mot. (Doc.
67) at 23.)  Petitioner alleges that testimony about this
identification could have been used to question witnesses about
their knowledge or recognition of this cross-dresser and whether
his physical characteristics matched those of the robber.
(Pet'r's Reply (Doc. 74) at 6-7 & Ex. 1 at 43.)

Counsel's declaration explains that he chose to interview
Officer Inch himself, rather than Lt. Jackson, and that Officer
Inch indicated only that the photo at issue resembled a criminal
whom he knew. (Trivette Decl. (Doc. 71-1) at 4.)  Officer Inch
indicated, however, that he could not say affirmatively that
Petitioner was not the bank robber. (Id.)

Petitioner neither provides a basis to show that an
interview of Lt. Jackson would have further developed this line
of evidence, nor to show that calling Officer Inch to the stand
or presenting this evidence would have affected the trial's
outcome.  Petitioner contends that witnesses and the jury should
have been allowed to consider whether Antonio Harris more
closely resembled the individual in the robbery photos, but

-14-

provides no basis for how this would have been accomplished, given that Mr. Harris was a fugitive at the time. (Pet'r's Reply (Doc. 74) at 6.) Counsel notes that his choice not to call Officer Inch was based on the Officer's uncertainty and the fact that he could not have conclusively identified the individual in the photograph. (Trivette Decl. (Doc. 71-1) at 4.)  Given Officer Inch's uncertainty as to the identification of the individual in the picture, Petitioner fails to overcome the strong presumption that counsel's determination that this testimony would not have assisted in the defense was reasonable.

### c.   Dustin Lear's Cellmates

Petitioner next alleges that counsel was ineffective in that he did not interview three individuals housed with Dustin Lear in prison. Petitioner alleges that these three prisoners would have testified that Dustin Lear told them that he owed Petitioner money for drugs and that he was afraid of Petitioner's retribution in connection with this debt. (Pet'r's Mot. (Doc. 67) at 23.) Petitioner intimates that Lear's fear led him to implicate Petitioner, rather than whichever individual was actually involved in the robbery, in order to send Petitioner to prison and ensure Lear's safety. (Pet'r's Reply (Doc. 74) at 7.)

Counsel responds that he _did_ attempt to interview the three individuals who were housed with Lear, but he was either denied an interview by their counsel or their counsel did not return his phone calls. (Trivette Decl. (71-1) at 4.) As counsel explains, even if the prisoners in question had been willing to testify as Petitioner contends, their testimony would have been weak and painted Petitioner in an even more negative light, thus harming his case more than helping it. (_Id._ at 4-5.) Both the lack of factual support in Petitioner's motion and the implausibility of Petitioner's theory as to the three prisoner's possible testimony render counsel's efforts to interview these men reasonable.

### d.   **Janice Hester**

Petitioner next alleges that counsel was ineffective because he did not interview Janice Hester. Ms. Hester testified at trial that the morning of the robbery, she saw Petitioner leave their home with Dustin Lear. (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 151-52.)  She explained on cross-examination that although she never actually saw Lear that day, she knew it was Lear because he had come to the house before, and she recognized the vehicle he was in. (_See_ _id._ at 156-57.)

Petitioner alleges that an investigation or interview would have prepared counsel to cross-examine Ms. Hester on whether or not she was sure that Petitioner left her house with Dustin Lear, as she testified. Petitioner alleges he did not leave with Lear, but rather with a different individual, named Mr. Huff. (Pet'r's Mot. (Doc. 67) at 35-36.)

Without prompting, Ms. Hester affirmatively names "Dustin" during the trial as the individual whom Petitioner was with on the day of the robbery. (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 151-52.) Petitioner provides no factual support for his contention that Ms. Hester did not correctly identify Lear, and while he names a "Mr. Huff" as the individual who was actually in the car, Petitioner provides no support for this statement. Further, as stated above, Petitioner's counsel cross-examined Ms. Hester about this exact topic, and she explained that she could identify Lear because she had seen Dustin Lear in his car before, that Petitioner had previously told her whom Dustin Lear was, and that Lear and Petitioner would sometimes look for jobs together. (Id. at 156-57.)

Counsel explains that, despite cross-examination, Ms. Hester was absolutely certain in her testimony that Petitioner left with Lear the day of the robbery. (See Trivette

-17-

Decl. (Doc. 71-1) at 7.)  As Petitioner has failed to allege how
an interview with Ms. Hester would have better prepared counsel
for this cross-examination, what new information would have been
discovered had he interviewed her, or how it would have affected
the outcome of the trial, he has not shown that counsel's
preparation or choices were unreasonable.

### e.  **Brandy White**

Similarly, Petitioner alleges that counsel was ineffective
because he did not interview Brandy White, the individual from
whom Lear testified that he got the purple bag used in the
robbery. Ms. White testified at trial that around the date of
the robbery, Dustin Lear came to her home, asked to borrow a
bag, and then left. (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59)
at 168-69.)  White further testified that she did not see Lear
with anyone else that day. (Id. at 173.)

Petitioner alleges that an interview of Ms. White would
have elicited (1) that Ms. White was unsure of when Lear came to
her house to obtain the bag used in the robbery, (2) that she
never saw anyone with Lear when he came to get the bag, and (3)
inconsistencies that would have better prepared counsel to
cross-examine Dustin Lear on the events of the morning,
specifically as to whether Lear asked Ms. White if "[they] could

use her bathroom." (Pet'r's Mot. (Doc. 67) at 36.)  However, Ms. White <u>did</u> testify at trial that she only interacted with Lear and did not see Petitioner in the house. Further, Ms. White testified only that she saw Mr. Lear "at some point around the time of the robbery." (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 168-69.)  As such, it appears that all of the issues that Petitioner contends would have been developed after an interview with Ms. White were actually elicited at trial. It is further unclear how such an interview would have aided counsel in his cross-examination of Dustin Lear, given that the statements Petitioner takes issue with are of little consequence in the context of the full trial.

Given Ms. White's limited knowledge, an interview before trial would have added little, if anything, to that information actually elicited at trial, a fact counsel points out in his declaration. (<u>See</u> Trivette Decl. (Doc. 71-1) at 8.)

As Petitioner has not explained how the interview of Ms. White would have uncovered information that affected the outcome of the trial in any way, he has not shown that counsel's choice not to interview her was unreasonable.

-19-

## f.  __Dustin Lear__

Petitioner next alleges counsel was ineffective because he failed to prepare to cross-examine Dustin Lear, contending that there were discrepancies and falsehoods in Lear's testimony that went un-tested during trial. (Pet'r's Motion (Doc. 67) at 28-29.)  Lear was the star witness for the Government during the case and testified about the robbery and his actions after it occurred. Petitioner contends both that the Government knew Lear was testifying falsely but still allowed him to testify and that counsel was not properly prepared to expose these false statements on cross-examination. (See Pet'r's Mot. (Doc. 67) at 28-29.)

First, Petitioner's claims that the Government knowingly allowed Lear to testify falsely are entirely conclusory and are not to be credited.  Second, according to counsel, the alleged discrepancies in Lear's testimony, to the extent they exist at all, were at most minor and not determinative of Lear's credibility.  Further, the Fourth Circuit noted on appeal both that Lear was subject to "piercing cross examination," and that the jury was well aware of his credibility issues, belying any allegations of ineffective counsel. Greene, 704 F.3d at 312.

The court notes that the overall thrust of Petitioner's complaint as to Lear is that counsel did not do enough to challenge his statements and discredit him, that he did not interview individuals mentioned by Lear, and that had he done so, it would have become clear that Lear was lying about Petitioner's involvement in the robbery. (See Pet'r's Reply (Doc. 74) at 21-34.) Petitioner provides little more than conjecture as to what would have been revealed at trial that would have exculpated him or affected the result, and his conclusory allegation that Lear implicated him out of fear is not to be credited without more evidence. As such, counsel's preparation for and cross-examination of Lear was reasonable.

## 2. **The Brady Violation**

Petitioner also alleges that counsel was ineffective because he did not investigate an alleged Brady violation by the Government, which Petitioner contends withheld allegedly-exculpatory phone records, or alternatively, because his counsel failed to obtain those records himself. (Pet'r's Mot. (Doc. 67) at 26-27.)

The Government responds that (1) there is no evidence from the case file that the Government ever obtained any cell phone records and, as such, there is no evidence in the record of a

-21-

Brady violation; and (2) counsel did not subpoena the records himself because the other evidence against Petitioner was strong enough that the phone records would not have produced any exculpatory evidence. (See Gov't Resp. (Doc. 71) at 8-9; Trivette Decl. (Doc. 71-1) at 5-6.) At trial, Dustin Lear mentions two different phone calls, testifying that Petitioner called him before the robbery, (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 96), and that he called Petitioner after the robbery to let him know the police were investigating. (Id. at 110.)

First, Petitioner fails to provide any evidence that the Government had actually obtained phone records other than a conclusory argument that if they did have them, they were required to turn them over because the phone records would have allowed counsel to impeach Dustin Lear on "contact, time, location, and who was with him at the time of the robbery," (Pet'r's Repl. (Doc. 74) at 9.) The Government is not under an obligation to disclose evidence that it does not possess, and as there is no evidence that the Government had the phone records, counsel's decision to not raise a Brady issue was reasonable.

Petitioner also contends in the alternative that counsel was ineffective for failing to obtain the phone records himself.

-22-

While Petitioner repeatedly references discrepancies in the trial testimony as to when he and Lear were allegedly in contact, Petitioner fails to explain first what the phone records would actually show, and second, how they would impeach Lear's testimony aside from minor timing issues. As such, he fails to show how the outcome of the trial would have been any different. Counsel contends that the evidence in the case was strong enough that the phone records would not have been exculpatory, and that he chose not to request them on this basis. (Trivette Decl. (Doc. 71-1) at 5.) Given the relative lack of importance of Lear's testimony about the phone calls as compared to the rest of the evidence in the case, counsel's decision not to request phone records, and instead impeach Lear in other ways, was reasonable.

### 3. **Failures to Object**

Petitioner also alleges that counsel was ineffective because he failed to raise objections at trial with regard to the following issues: (1) the chain of custody for a pair of sunglasses that were allegedly worn during the robbery; (2) a violation of his right to a speedy trial; (3) the admission of allegedly false testimony given by Dustin Lear; (4) hearsay testimony by Angela Lear; (5) the use of photo identification by

Dustin Lear; and (6) resemblance testimony that was elicited at trial.

First, Petitioner argues that counsel was ineffective for failing to raise, and thus waiving, a chain of custody issue regarding a pair of sunglasses recovered from Petitioner's home. (Pet'r's Mot. (Doc. 67) at 17-21.) At trial, counsel questioned Sergeant Laura Carden, the investigating officer who seized the sunglasses, about the sunglasses in evidence. (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 211.) Carden testified that they were the sunglasses that she took from the house, and that her handwriting was on the evidence bag, along with Officer Yurco's initials. (Id. at 212-13.) There was initially an issue about whether the evidence bag had been sealed or not, but after conferring with the Government, counsel explained that he had been present in the U.S. Attorney's office when the bag had been opened, and that he did not have a chain of custody issue. (Id. at 212-14.)

Petitioner has failed to explain how pursuing a chain of custody issue would have affected the result of the trial, because Petitioner fails to allege anything to show an actual issue with the chain of custody or the identification of the sunglasses. Further, counsel's declaration is consistent with

-24-

his statements and actions during trial: he was present when the sealed bag containing the sunglasses was opened and, thus, he had no basis for a valid chain of custody dispute. (See Trivette Decl. (Doc. 71-1) at 3); Pet'r's Reply (Doc. 74) at 3-4.) As such, raising such a contention would have been frivolous, and it was reasonable for counsel to choose not to do so.

Next, Petitioner contends that counsel was ineffective because he failed to raise a violation of Petitioner's right to a speedy trial. Petitioner contends that he was arrested on state charges on May 8, 2009, but was not indicted on federal charges until April 26, 2010. (Pet'r's Mot. (Doc. 67) at 24-25.) Petitioner alleges this "delay" in indictment was a ruse designed to let the witnesses' "memory's [sic] to fade" and result in his conviction. For this contention, Petitioner cites to United States v. Woolfolk, 399 F.3d 590, 596 (4th Cir. 2005).

However, as the Government argues, that case is unavailing and distinguishable on its facts. In Woolfolk, the Fourth Circuit held that, for the purposes of the Speedy Trial Act, time begins to run when a person is being held "for the purpose of answering a federal charge." Id. The court took this to mean a situation where the Government has knowledge that an individual is being held by state authorities solely to answer

-25-

to federal charges. Id. Here, Petitioner was not indicted on federal charges until April 26, 2010, and arrested on June 24, 2010, and he has alleged no facts showing that he was being held in state custody solely to answer for federal charges. (Pet'r's Mot. (Doc. 67) at 25.) As such, June 24, 2010 is the date that triggered the thirty-day timeframe under the Speedy Trial Act. Thus, counsel is correct in that such a claim would have been frivolous, and the decision not to pursue such a claim was reasonable.

Petitioner also alleges that counsel was ineffective because he failed to properly research and object to hearsay testimony by Angela Lear. (Pet'r's Mot. (Doc. 67) at 32-33.) Petitioner argues that although counsel objected to her hearsay testimony of Angela Lear at trial, he was "not prepared for his arguments with the Court." (Id. at 32.) Petitioner argues that counsel did not know the correct section of the Federal Rules of Evidence on which to object, or have an argument to support his objection other than arguing that the statement was hearsay. (See id.) Petitioner claims that counsel failed to "present a coherent argument []or establish a clear record for the appellate court." (Id. at 33.)

At trial, Angela Lear testified that Dustin Lear had told her that he robbed the bank with Petitioner. (See Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 142.) The court first notes that counsel did raise a timely objection on hearsay grounds, thus preserving the issue for appeal. The court simply rejected counsel's hearsay argument, holding that Ms. Lear's statements were admissible as an exception under Federal Rule of Evidence 803 as a prior consistent statement. (See id. at 142-43.)[6] Petitioner fails to explain why the hearsay objection was incorrectly resolved, and further, Petitioner fails to show that even had the court granted the objection, that it would have affected the result of the trial. Counsel's objection and advocacy in favor of his objection were reasonable.

Next, Petitioner contends that counsel was ineffective because he failed to object to allegedly-false testimony by

---

[6] At trial, counsel attempted to argue that Rule 613 would bar the testimony at issue, and the court overruled the argument, explaining that because evidence had been presented that Lear may have been fabricating his story to gain a reduced sentence, that his prior consistent statements made before he entered into his plea deal were relevant as to credibility. (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 142-43.)

-27-

Dustin Lear.[7] (Pet'r's Mot. (Doc. 67) at 28-29.) Petitioner provides no evidence or supporting facts to show how any part of Lear's testimony was false. Rather, Petitioner makes conclusory allegations such as "had counsel been prepared for Lear he would been able to demonstrate that Lear had not only 'Lied' [sic] to the police early on but was also testifying falsely at that moment." (Pet'r's Reply (Doc. 75) at 21.)

As an initial matter, counsel <u>did</u> demonstrate that Lear lied to the police early on, eliciting testimony that Lear had identified an individual named "Slim" as a person he had lent his car to on the day of the robbery before changing later his story. (<u>See</u> Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 128-29.)

As to Petitioner's allegations about Lear's other alleged falsehoods, Petitioner's allegations are conclusory, and Petitioner provides no evidence that the discrepancies in Lear's testimony were anything other than minor, if they existed in the

---

[7] Petitioner's contentions are somewhat confused on this issue. Although styled as a "failure to object" in his initial motion, Petitioner complains essentially that the Government knowingly allowed Lear to testify falsely, and that had counsel prepared adequately, he would have known that Lear was doing so. (See Pet'r's Mot. (Doc. 67) at 28-29.) In his Reply, Petitioner details Lear's testimony during trial, taking issue with numerous alleged inconsistencies that he believes should have been probed further. (See Pet'r's Reply (Doc 74) at 21-34.)

-28-

first place.  Counsel's choices regarding which topics to focus on during cross-examination are exactly the sort of routine trial decisions that are entitled to deference. (See Strickland, 466 U.S. at 689 (Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."). Petitioner's complaints about various inconsistencies in testimony do not meet this standard, and counsel's cross-examination and choices at trial were reasonable.

Petitioner also alleges that counsel was ineffective because he failed to object to testimony that Lear identified Petitioner from a single police photograph, rather than a line-up or photo array. (Pet'r's Mot. (Doc. 67) at 38-39.) Petitioner cites to Simmons v. United States, 390 U.S. 377 (1968), to support this argument and notes that the Fourth Circuit commented on the propriety of this testimony while the case was

on appeal. (Pet'r's Mot. (Doc. 67) at 39.)[8] However, there is no evidence presented to show that the use of a single photograph was misleading or that Lear would have failed to identify the Petitioner in a traditional line-up.  As the Government shows, Lear had known Petitioner for months before the robbery and had named him and taken the police to his residence <u>before</u> identifying him with the photo.  (Gov't Resp. (Doc. 71) at 11.) As such, Petitioner has failed to show that, even if counsel's failure to object was in fact unreasonable, it affected the outcome of the trial in any way.

Finally, Petitioner alleges that counsel failed to object to testimony by one of the bank tellers, Alice Bolder, as to whether or not she noticed any similarities between Petitioner and the robber.  (Pet'r's Mot. (Doc. 67) at 40-41.)  After being prompted, Ms. Bolder testified that "the nose, I remember the teeth, the slimness of the face, and vaguely the mouth." (Trial Tr., Day Two, Oct. 5, 2010 (Doc. 59) at 75-76.)

---

[8] "In this regard, we think it is particularly weighty that, without objection, Lear was permitted to testify at trial as to his photographic identification of [Petitioner] from a single photo displayed by investigating officers after Lear confessed to his role in the crime within two days of the robbery." <u>Greene</u>, 704 F.3d at 312 n.6

At the outset, this court notes that the Fourth Circuit found that allowing this line of questioning was plain error but explained that because of the "strong independent evidence linking [Petitioner] to the bank robbery," the admission of this testimony did not affect Petitioner's substantial rights. Greene, 704 F.3d at 312. Given that Bolder's testimony did not affect Petitioner's substantial rights or affect the outcome of the trial, Petitioner was not prejudiced by counsel's failure to object to this evidence.

### 4. The Fourth Amendment Violation

Petitioner also alleges that counsel failed to argue that there was a Fourth Amendment violation when the police came to Petitioner's home to corroborate Lear's story. (Pet'r's Mot. (Doc. 67) at 30.) The Government and counsel note that the police did visit Petitioner's home under the guise of a drug investigation in order to determine whether or not he lived at the residence. (See Gov't Resp. (Doc. 71) at 9; Trivette Decl. (Doc. 71-1) at 6.) Petitioner fails to allege any facts to support that the police entered his home or that they searched any rooms, and the later search that returned the evidence used at trial was conducted pursuant to a warrant. (PSR ¶ 8.) As such, even if an illegal search took place as Petitioner

alleges, he has failed to show that it had any affect on the outcome of the trial, as the evidence actually used against him was the product of a valid search warrant.

All of the alleged failures by counsel discussed <u>supra</u> represent the sort of routine strategic trial decisions and choices that trial counsel make in every trial and that are entitled to strong deference by this court. <u>Christian v. Ballard</u>, 792 F.3d 427, 446 (4th Cir.), <u>cert. denied sub nom Christian v. Plumley</u>, ____ U.S. ____, 136 S. Ct. 342 (2015). Petitioner has failed to allege that reversing any of these decisions would have made it reasonably likely that the outcome of his trial would have been different, has failed to provide any facts to support his current theory of the case, and has failed to show that any of these decisions fell below the standard reasonably expected of counsel. As such, Petitioner's claims on all of these grounds will be denied.

### 5.   <u>Failure to Investigate Alibi</u>

However, Petitioner also alleges that counsel failed to investigate and put forth alleged alibi evidence, namely, that he was at a Game Stop store completing the trade-in of a video game system when the alleged robbery took place. (Pet'r's Mot. (Doc. 67) at 31.)  Petitioner alleges that he told counsel of

-32-

this alibi and that counsel failed to raise it at trial.
Petitioner further alleges that documentation of this alibi can
be found with his former attorney, whose name and address he has
provided.  (See Pet'r's Reply (Doc. 74) at 10.)  This contention
creates a factual issue, as counsel contends that Petitioner
never gave him this alibi information. (Trivette Decl. (Doc.
71-1) at 6.)  Further, counsel did proffer an alibi for
Petitioner: that he was asleep with his girlfriend, Christina
Curl, until noon on the day of the robbery.  (Notice of Alibi
(Doc. 23) at 1.)  This court finds that this discrepancy creates
a factual dispute over an issue that may create a reasonable
probability that the outcome of the trial would have been
different.  As this issue cannot be resolved on the current
briefing, the court will order an evidentiary hearing to resolve
it.

      **B.**   **Ground Two – Appellate Counsel**

As explained above, claims for ineffective assistance of
appellate counsel are also analyzed under the <u>Strickland</u> test,
and thus Petitioner must demonstrate both that appellate
counsel's performance was deficient and that but for that
deficiency, there was a reasonable probability that the result
on appeal would have been different.

-33-

Further, appellate counsel is not obligated to raise every possible ground for appeal. United States v. Mason, 774 F.3d 824, 828 (4th Cir. 2014), cert. denied, ____ 136 S. Ct. 514 (2015). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Lawrence v. Branker, 517 F.3d 700, 709 (4th Cir. 2008) (internal quotations omitted).

In the instant case, appellate counsel raised several issues, one of which the Fourth Circuit found to constitute plain error. Petitioner alleges that his counsel was ineffective because they failed to raise several other issues that were mentioned in passing by the Fourth Circuit, namely, the alleged hearsay testimony of Angela Lear and the use of a single photo for identification by Dustin Lear. (Pet'r's Reply (Doc. 74) at 37.) However, as explained above, Petitioner has already failed to show that either of these issues actually prejudiced him at trial. As such, it was not error to choose not to raise them on appeal, especially when clearly stronger issues, such as the admission of resemblance testimony, were raised. The choice by counsel to pursue these issues, rather than those that Petitioner alleges that counsel should have raised, represent

-34-

exactly the sort of reasonable strategic decisions that are
entitled to deference by this court.

### C.   **Ground Three – Basis for Career Offender Status**

As discussed above, Petitioner has moved to amend his
original motion to vacate (Doc. 75).  In addition to his
original claims on Ground Three that are based on Descamps v.
United States, 570 U.S. ____, 133 S. Ct. 2276 (2013), Petitioner
has moved to amend, now citing to Johnson v. United States, ____
U.S. ____, 135 S. Ct. 2551 (2015), as support for his argument
that he was unfairly assigned career offender status, resulting
in an enhanced sentence.  This court will dismiss both claims.

Petitioners argues that under Descamps, his predicate
conviction of strong arm robbery from 1997 no longer qualifies
as a conviction for purposes of the career offender enhancement.

In Descamps, the Supreme Court held that, in judging
whether a conviction qualifies under the ACCA, courts "may not
apply the modified categorical approach when the crime of which
the defendant was convicted has a single, indivisible set of
elements."  133 S. Ct. at 2282.  As such, courts are not
permitted to consult additional documents, such as an indictment
or jury instructions, and then determine that a prior conviction

-35-

qualifies as an ACCA predicate even though the elements of the crime fail to satisfy the categorical test.  <u>Id.</u> at 2281.

However, as the Government correctly points out, Petitioner was not sentenced under the ACCA, but rather under the sentencing enhancement for career offenders, found in USSG § 4B1.1(a).  (<u>See</u> PSR ¶ 38.)  The Sentencing Guidelines differ from the ACCA in several ways.  Most importantly, the two apply under different circumstances.  The ACCA applies when a defendant has three prior convictions for "a violent felony," while the career offender enhancement applies under the sentencing guidelines when a defendant "has at least two prior felony convictions of a crime of violence or a controlled substance offense." <u>Compare</u> 18. U.S.C. ¶ 924(e) <u>with</u> USSG § 4B1.1(a).[9]

It should be noted that the commentary for § 4B1.1(a) includes robbery under the list of "crimes of violence," and that the Fourth Circuit has specifically found that South Carolina's offense of strong arm robbery does in fact qualify as a "crime of violence" under § 4B1.1(a).  <u>See</u> <u>United States v.</u>

---

[9] "It is to be noted that the definitions of 'violent felony' . . . in 18 U.S.C. § 924(e)(2) are not identical to the definitions of 'crime of violence' . . . used in § 4B1.1." <u>See</u> USSG § 4B1.1 cmt n.1.

-36-

<u>Barr</u>, 438 Fed. App'x 233, 234 (4th Cir. 2011) (unpublished).  As such, Petitioner's argument under <u>Descamps</u> is inapplicable here.

Petitioner's Motion to Amend his Petition to add a claim under <u>United States v. Johnson</u> will be denied, because such a claim is not cognizable on collateral review.  <u>See</u> <u>United States v. Foote</u>, 784 F.3d 931, 943 (4th Cir.), <u>cert. denied</u>, ____ U.S. ____, 135 S. Ct. 2850 (2015).

## IV.  <u>CONCLUSION</u>

**IT IS THEREFORE ORDERED** that Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 67) is **GRANTED IN PART** and an evidentiary hearing will be held consistent with matters discussed herein to resolve the factual issue Petitioner raises as to the alibi defense, as explained herein.  All other claims are **DENIED**.

**IT IS FURTHER ORDERED** that an evidentiary hearing be held before the undersigned on March 29, 2016, at 2 p.m. in Courtroom 1, Greensboro. The government is responsible for producing Petitioner at said hearing.

**IT IS FURTHER ORDERED** that counsel will be appointed to represent Petitioner at said hearing.

**IT IS FURTHER ORDERED** that Petitioner's remaining claims be, and the same hereby are, dismissed.

-37-

**IT IS FURTHER ORDERED** that Petitioner's Motion to Amend 28

U.S.C. § 2255 (Doc. 75) is **DENIED**.

This the 20th day of January, 2016.

_____
United States District Judge